**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

CHRISTOPHER LYNN HICKMAN,   )
                                )
        **Plaintiff,**       )
                                )   **No. 1:13-cv-00089**
v.                           )   **Judge Nixon/Magistrate Judge Brown**
                                )
CAROLYN W. COLVIN,        )
COMMISSIONER OF          )
SOCIAL SECURITY,          )
                                )
        **Defendant.**     )

**To: The Honorable John T. Nixon, Senior United States District Judge**

### REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks review of the Social Security

Administration Commissioner's decision denying Plaintiff's application for disability insurance

benefits ("DIB") under Title II of the Social Security Act ("Act") and supplemental security

income ("SSI") under Title XVI of the Act. (DE 19-1, p. 1).[1] For the following reasons, the

Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative

record (DE 19) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

### I.    PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on February 12, 2010, stating his disability began on

October 13, 2008. (DE 16, pp. 93-96, 112-114). Plaintiff's requests were denied on May 17,

2010, and upon reconsideration on October 13, 2010. (DE 16, pp. 62-63). On November 11,

2010, Plaintiff requested a hearing with an administrative law judge ("ALJ"). (DE 16, pp. 76-

78). Present at Plaintiff's subsequent administrative hearing were his attorney and a vocational

---

[1] "DE" refers to Docket Entry. Page citations refer to the ECF number "page __ of __" on each page of the docket entry.

expert ("VE"). (DE 16, p. 43). The ALJ issued an unfavorable decision on January 3, 2012, based on the following findings of fact and conclusions of law:

(1) The claimant meets the insured status requirements of the Act through December 31, 2013.

(2) The claimant has not engaged in substantial gainful activity ("SGA") since October 13, 2008, the alleged onset date.

(3) The claimant has the following severe impairments: discogenic back disorder; and anxiety disorder.

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except the claimant must be allowed to sit or stand as needed, and be limited to only occasional interpersonal contact with co-workers and the public.

(6) The claimant is unable to perform any past relevant work.

(7) The claimant was thirty-seven years old, which is defined as a younger individual age eighteen to forty-nine, on the alleged disability onset date. At hearing, the claimant was forty years old.

(8) The claimant has a limited education (8th grade) and is able to communicate in English.

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

(10) Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(11) The claimant has not been under a disability, as defined in the Act, from October 13, 2008, through the date of this decision.

(DE 16, pp. 23-36). On June 10, 2013, the Appeals Council denied Plaintiff's request for review.

(DE 16, p. 5). Plaintiff thereafter filed this Complaint on August 9, 2013. (DE 1). Defendant filed

an answer (DE 15) and the administrative record (DE 16) on October 25, 2013. Plaintiff moved for judgment on the record on December 5, 2013. (DE 19). Defendant responded to Plaintiff's motion on February 19, 2014. (DE 24). The matter is properly before the Court.

## II.    REVIEW OF THE RECORD

### A.  MEDICAL EVIDENCE

#### A.  Hickman Medical Clinic

Plaintiff was treated at the Hickman Medical Clinic from July 2007 to November 2008. (DE 16, pp. 197-205). Dr. Elyas Safar M.D. treated Plaintiff on October 22, 2008 for low back pain and radiating bilateral leg pain. (DE 16, pp. 199-200). Noting that Plaintiff had a history of spondylolisthesis,[2] Dr. Safar referred Plaintiff to an orthopedist. (DE 16, p. 200). On that same day, Dr. Steven Tishler M.D. x-rayed Plaintiff's lumbar spine, finding degenerative loss of disc space at L5-S1 and "[g]rade 1 anterolisthesis of L5 relative to S1 likely on the basis of bilateral pars articularis defects." (DE 16, p. 201).

#### 2.  Mid-Tennessee Bone and Joint Clinic

On October 24, 2008, Dr. Scott W. McCall M.D. treated Plaintiff's back pain at the referral of Dr. Safar. (DE 16, p. 208). Though he briefly remarked that Plaintiff was "Psych positive for depression, nervousness," his treatment notes mainly focus on Plaintiff's physical examination. (DE 16, p. 208). Dr. McCall stated that Plaintiff's spine was "diffusely tender" with a decreased range of motion. (DE 16, p. 208). After considering the x-rays provided by Hickman County, he noted they showed "Grade I to II spondylolisthesis with degenerative change at L5-S1," and was under the impression Plaintiff's spondylolisthesis was Grade II. (DE 16, p. 209). Dr. McCall treated Plaintiff again on November 26, 2008, again noting that Plaintiff suffered

---

[2] Defined as "Forward displacement . . . of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis." Dorland's Illustrated Medical Dictionary 1754 (32nd ed. 2012).

from Grade II spondylolisthesis with some chronic degenerative change which would likely need a fusion. (DE 16, p. 210).

On December 12, 2008, Dr. James Grippo, a radiologist at Mid-Tennessee Bone and Joint Clinic, found "bilateral L5 pars defect with resultant grade-1 anterolisthesis" and "focal degenerative disk changes at L3-L4, which produce mild left neuroforaminal stenosis with abutment of the excited left L3 nerve root." (DE 16, pp. 211-212). Dr. J. Frederick Wade M.D. also treated Plaintiff on December 12, 2008, noting the impression of isthmic spondylolisthesis L5-S1 with possible degeneration of the L4-5 disc. (DE 16, p. 213).

### 3. Columbia Orthopedic Clinic

Columbia Orthopedic Clinic treated Plaintiff's back problems from March 2009 to April 2009. (DE 16, p. 125). On March 23, 2009, Plaintiff complained of pain in his back and legs. (DE 16, p. 216). The impression consisted of "[l]ow back pain, radicular type with spondylosis, and spondylolisthesis and L5-S1 degenerative disc disease." (DE 16, p. 216). Plaintiff was treated on April 6, 2009 for severe pain and discomfort. (DE 16, p. 215). At the time, he was participating in physical therapy. (DE 16, p. 215).

### 4. Williamson Medical Center and Vanderbilt Bone and Joint Clinic

Dr. Michael J. McNamara M.D. admitted Plaintiff to Williamson Medical Center on September 8, 2009 regarding Plaintiff's low back and lower extremity pain. (DE 16, p. 218). Noting that physical therapy, nonsteroidal anti-inflammatories, and epidural steroid injections did not provide relief, Dr. McNamara suggested surgical treatment. (DE 16, p. 218). He noted that Plaintiff's "[r]ange of motion in the lumbar spine was decreased in all planes" and that Plaintiff suffered from isthmic spondylolisthesis. (DE 16, p. 219). Plaintiff was discharged on

September 11, 2009 after undergoing a "[d]ecompression lumbar laminectomy and fusion L5-S1." (DE 16, pp. 219-220).

On September 21, 2009, Plaintiff saw Dr. McNamara for a post-operative visit. (DE 16, p. 238). Plaintiff reported significant pain which was gradually improving. (DE 16, p. 238). Though Plaintiff had some left thigh numbness, the range of motion in his hip, knee, and ankle was normal. (DE 16, p. 238). Dr. McNamara opined that Plaintiff's L5-S1 fusion was in good position and directed Plaintiff to continue a walking program. (DE 16, p. 238).

Plaintiff later complained of back pain again on October 26, 2009. (DE 16, pp. 238-239). One month later, Dr. McNamara noted that Plaintiff was "actually doing relatively well," and Plaintiff's back pain was generally improving. (DE 16, pp. 239-240). After participating in physical therapy, Plaintiff visited Dr. McNamara for another post-operative appointment on January 20, 2010. (DE 16, p. 241). Dr. McNamara directed Plaintiff to continue his walking program and physical therapy sessions, after which Plaintiff would be returned to the workforce, albeit with possible lifting restrictions. (DE 16, p. 242). On February 24, 2010, Dr. McNamara noted that Plaintiff had completed physical therapy, had regained much of his range of motion, but that Plaintiff still had back pain with any type of lifting. (DE 16, p. 242). Dr. McNamara placed Plaintiff at maximum medical improvement and opined that Plaintiff could lift up to forty pounds. (DE 16, p. 243).

Dr. McNamara provided a Medical Source Statement dated November 21, 2011. (DE 16, p. 404). In it, he states that as a result of Plaintiff's spondylolisthesis, he experienced low back pain and buttock pain and that Plaintiff's impairments could last for at least twelve months. (DE 16, p. 404). He opined that emotional factors did not contribute to these limitations and estimated that Plaintiff could walk one to two blocks without rest or severe pain; sit for thirty minutes

before needing to get up; stand for twenty minutes before needing to change positions; sit for four hours in an eight-hour workday; stand or walk for two hours in an eight-hour work day; and would need a job with a sit-stand option. (DE 16, p. 405). Dr. McNamara stated that Plaintiff needed to walk about five minutes every thirty minutes and would need to take one to five unscheduled breaks during a working day, but would not need to elevate his leg with prolonged sitting. (DE 16, p. 406). Plaintiff could occasionally lift less than ten pounds, rarely lift ten pounds and stoop, and never twist, crouch, or climb ladders or stairs. (DE 16, p. 406). Plaintiff's symptoms would interfere with his attention and concentration for ten percent of the day, and Plaintiff was capable of low stress work. (DE 16, p. 407). According to Dr. McNamara, Plaintiff would likely miss work about three days per month due to his impairments. (DE 16, p. 407).

### 5. Tennessee Physical Medicine and Pain Management

Dr. T. Scott Baker M.D. from Tennessee Physical Medicine and Pain Management treated Plaintiff on March 15, 2011 for back pain and lower limb pain. (DE 16, p. 289). Plaintiff rated his pain as a "five" on a scale of zero to ten, but stated that his pain was adequately controlled. (DE 16, p. 289). While Plaintiff admitted to anxiety, stiffness, and leg cramps, he denied limitation of motion, shoulder pain, and hip pain. (DE 16, p. 290). His mood was normal, and he had a normal gait pattern and was able to walk on his toes, heels, squat, and return. (DE 16, p. 291). Dr. Baker's assessment consisted of: left lumbosacral radiculopathy, failed back surgery syndrome, and chronic pain syndrome. (DE 16, p. 291).

On April 12, 2011, Plaintiff reported back pain which radiated into his left leg and ankle. (DE 16, p. 287). According to Plaintiff, the pain was a "four" on a scale of zero to ten, and the pain was adequately controlled through opioid therapy. (DE 16, p. 287). Past medical history included lumbar disk surgery, anxiety, and depression. (DE 16, p. 287).

### 6. Centerstone Mental Health

Ms. Viviana Grice M.A., an out-patient psychotherapist,[3] performed an intake assessment of Plaintiff on October 12, 2010. (DE 16, p. 297). She noted Plaintiff's history of back problems. (DE 16, p. 298). Plaintiff requested assistance in coping with his panic attacks, difficulty sleeping, depression, and anger management problems. (DE 16, p. 299). Ms. Grice diagnosed Plaintiff with bipolar II disorder current or most recent episode hypomanic and degenerative disc disorder. It appears that information from Plaintiff's intake interview was used to complete a Tennessee Clinically Related Group ("CRG") form that same day. (DE 16, pp. 293-295). The CRG form reports that Plaintiff is markedly limited in activities of daily living, interpersonal functioning, concentration, task performance, and pace, and adaptation to change. (DE 16, pp. 293-294). These responses lead to a finding that Plaintiff is a person with severe and persistent mental illness. (DE 16, p. 295). The CRG lists Plaintiff's lowest GAF as 35, highest GAF as 45, and current GAF as 35. (DE 16, p. 295).

Ms. Grice later counseled Plaintiff on October 20 and 26, 2010; November 3, 10, and 18, 2010; December 1, 7, and 28, 2010; January 7, 19, and 26, 2011; February 2, 9, and 17, 2011; March 3 and 17, 2011; April 5, 2011; and May 5 and 19, 2011.[4] During these visits, Ms. Grice noted that Plaintiff's emotional and behavioral health steadily improved. Plaintiff reported decreased anxiety from deep breathing relaxation, but also stated that he had social anxiety in crowded places. (DE 16, pp. 328, 337, 358-362, 370-371, 373). One of Plaintiff's treatment objectives included "vocational rehab to learn skills for future employment." (DE 16, p. 311). He also reported experiencing side effects from Remeron and Prolixin, including sleeping for ten to twelve hours, drowsiness, dizziness, light-headedness, and incoordination. (DE 16, pp. 369-371).

---

[3] Plaintiff also refers to Ms. Grice as a Licensed Professional Counselor, Mental Health Service Provider. (DE 19-1, p. 10).
[4] DE 16, pp. 317, 320, 327, 336, 346-347, 349, 353, 355, 357, 359-362, 366-367, 373, 377, 380, 384, 389, 392, 395.

Plaintiff reported no side effects from taking Lithium. (DE 16, p. 337). As of May 27, 2011, Ms. Grice listed Plaintiff's diagnoses as bipolar II disorder current or most recent episode hypomanic, panic disorder without agoraphobia, and degenerative disc disorder. (DE 16, p. 296). Ms. Grice indicated that Plaintiff's lowest, highest, and current GAF scores were 40. (DE 16, p. 296).

Ms. Melinda Stahley, a nurse practitioner at Centerstone, performed a psychiatric evaluation of Plaintiff on December 7, 2010. (DE 16, p. 301). She noted that Plaintiff was "very anxious with pressured speech." (DE 16, p. 301). Plaintiff's diagnosis consisted of panic disorder without agoraphobia, bipolar II disorder current or most recent episode hypomanic, degenerative disc disorder, GAF score of 40. (DE 16, p. 304). Dr. Amanda Bachuss M.D. signed the report. (DE 16, p. 305). Ms. Stahley again treated Plaintiff on March 8, 2011. (DE 16, p. 343). Dr. Bachuss next signed off on a medical progress note in April 2011 in which Plaintiff "present[ed] in bright spirits and report[ed] level mood and adequate sleep." (DE 16, pp. 329-330).

Ms. Grice provided a Medical Source Statement in November 2011. (DE 16, p. 400). She indicated that beginning August 2010 Plaintiff had moderate difficulties in understanding and remembering simple instructions, carrying out simple instructions, making judgments on simple work-related decisions, and interacting appropriately with the public. (DE 16, pp. 400-401). She additionally remarked that Plaintiff was markedly impaired in his ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with supervisors and co-workers, and respond appropriately to usual work situations and changes in a routine work setting. (DE 16, pp. 400-401).

## B. CONSULTATIVE ASSESSMENTS

### 1. Vocational Examiner – Mr. Robert G. Burns

On May 17, 2010, Mr. Burns reported that Plaintiff's exertional abilities were limited to light work which constitutes lifting a maximum of twenty pounds, frequently lifting ten pounds, standing or walking for six hours in an eight-hour workday, and sitting for six hours in an eight-hour workday. (DE 16, p. 146). He found that Plaintiff could occasionally climb ladders and could frequently climb stairs, balance, stoop, kneel, crouch, and crawl. (DE 16, p. 146). He further noted that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (DE 16, p. 146). According to Mr. Burns, Plaintiff could function as a power screwdriver operator (light, SVP[5] 2), production assembler (light, SVP 2), or laboratory sample carrier (light, SVP 2). (DE 16, pp. 147-148).

### 2. Vocational Examiner – Mr. Paul Anglin

On October 13, 2010, Mr. Anglin opined that Plaintiff could only perform light work and could only occasionally climb stairs, climb ladders, balance, stoop, kneel, crouch, or crawl. (DE 16, p. 172). He made the same mental RFC findings and "other occupation" findings as did Mr. Burns. (DE 16, pp. 172, 174) (*see* DE 16, pp. 146, 148).

---

[5] SVP or "specific vocational preparation" refers to the time required to prepare for a specific vocation.

### 3. Psychological Assessment – Dr. Mark W. Petro Ph.D.

Dr. Petro provided a psychological assessment on April 6, 2010. (DE 16, p. 233). Plaintiff was "oriented to time, place, person, and situation. His expressive language, receptive language, thought form, and though[t] cont[en]t were within normal limits." (DE 16, p. 235). His GAF was 52, and he "endorsed the depressive symptoms of depressed mood, insomnia, and feeling of worthlessness." (DE 16, p. 235). According to Dr. Petro, Plaintiff may have mild-to-moderate difficulty in his ability to consistently understand and remember complex instructions, directions, and procedures; exhibit sustained concentration and persistence for making complex decisions; persist during workdays without interruptions from psychological symptoms; consistently and appropriately interact with subordinates, peers, management, and the general public; and consistently and appropriately take needed precautions against recognized work sit hazards. (DE 16, pp. 236-237). Plaintiff may also have mild difficulty in responding to changes in the work schedule on an independent basis. (DE 16, p. 236).

### 4. Psychiatric Review Technique and Mental RFC – Dr. Andrew J. Phay Ph.D.

Dr. Phay provided a psychiatric review technique on April 26, 2010. (DE 16, p. 247). He noted that Plaintiff had a "depressed mood" and a GAF of 52. (DE 16, p. 259). With regard to Listing 12.04 Affective Disorders, Dr. Phay reported that Plaintiff suffered from chronic adjustment disorder with depressed mood, but that the impairment did not precisely fit the diagnostic criteria. (DE 16, p. 250). Similarly with Listing 12.06 Anxiety-Related Disorders, Dr. Phay noted that Plaintiff suffered from generalized anxiety disorder but it did not fit the diagnostic criteria. (DE 16, p. 252). Dr. Phay also noted that Plaintiff's "CLUSTER C P.D. TRAITS" did not satisfy the diagnostic criteria of Listing 12.08 Personality Disorders. (DE 16, p. 254). In relation to the "B" listing criteria, Dr. Phay found that Plaintiff was mildly restricted in

activities of daily living, moderately restricted in maintaining social functioning and maintaining concentration, persistence, or pace, and not restricted by episodes of decompensation of extended duration. (DE 16, p. 257). Dr. Phay found no evidence of "C" listing criteria. (DE 16, p. 258).

Dr. Phay additionally completed a Mental RFC Assessment of Plaintiff on April 26, 2010. (DE 16, p. 260). In it, he found that Plaintiff was only moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (DE 16, pp. 260-261). Additionally, Dr. Phay reported that Plaintiff could: remember locations and work like procedures, understand and remember simple and detailed tasks, perform simple and detailed tasks, maintain concentration for at least two hours, perform routine daily activities, complete a normal work week with acceptable performance and productivity, sustain an ordinary work routine around others, make acceptable simple work-related decisions, appropriately interact with the general public, supervisors, and peers in the work place with occasional disruptions due to psychologically based symptoms, maintain basic standards of neatness and cleanliness, be aware of and appropriately respond to infrequent changes in the work place, travel to unfamiliar places, and set and pursue realistic work goals. (DE 16, p. 262). Dr. Horace F. Edwards Ph.D. affirmed this assessment on August 19, 2010. (DE 16, p. 273).

### 5. Physical RFC – Dr. Michael N. Ryan M.D.

On May 15, 2010, Dr. Ryan completed a physical RFC evaluation for Plaintiff. (DE 16, p. 264). He found that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (DE 16, p. 265). Plaintiff could occasionally climb ladders and could frequently climb stairs, balance, stoop, kneel, crouch, and crawl. (DE 16, p. 266). Though Plaintiff's symptoms were credible at the time, Dr. Ryan expected the symptoms to improve and the pain to resolve over time. (DE 16, p. 269).

### 6. Physical RFC – Dr. Frank R. Pennington M.D.

On October 11, 2010, Dr. Pennington completed a physical RFC evaluation for Plaintiff. (DE 16, p. 278). He came to the same conclusions as Dr. Ryan, except he found that Plaintiff's postural limitations (e.g. climbing and kneeling) were all limited to occasional occurrences. (DE 16, pp. 279-280). He found that Plaintiff's impairments could reasonably be expected to produce the alleged symptoms, but he found Plaintiff's claims regarding the intensity, persistence, and limiting effect of these symptoms only partially credible. (DE 16, p. 283).

## C. PLAINTIFF'S TESTIMONY

Plaintiff previously worked as a brick mason and as a bricklayer. (DE 16, p. 48). He attended vocational school in Nashville for three years and was a union member. (DE 16, p. 48). Plaintiff can drive, but he stated he cannot drive very far because the driving position hurts his back. (DE 16, pp. 51-52). During the day, Plaintiff stated he does not watch television; rather, he listens to music and tries to read but it confuses and upsets him. (DE 16, p. 49). He stated he does very limited household chores, including doing the dishes and the laundry every now and then.

(DE 16, p. 49). He described his general day as "get up, just stir about, try to keep moving as best I can. . . . I'll try to do mild, light stuff at the house." (DE 16, p. 56).

According to Plaintiff, his doctor and his sister told him not to lift anything. (DE 16, p. 50). Although Plaintiff could not remember the specific lifting weight limit imposed by his doctor, he estimated it was around thirty to thirty-five pounds but stated he could only lift ten to fifteen pounds. (DE 16, p. 50). According to Plaintiff, he suffers from constant pain in his mid-back and lower, left leg which is relieved by ice, heat, elevation, and pain medication. (DE 16, pp. 50-51). At his attorney's prompting, Plaintiff identified the pain as "radiating" and that he generally elevates his left leg for two hours in an eight-hour period. (DE 16, p. 56). Even while taking pain medication, Plaintiff states his pain is still a "five or six" on a scale of one to ten. (DE 16, p. 57). Plaintiff listed side effects from his pain medication, Hydrocodone and Lyrica, as drowsiness and nausea. (DE 16, p. 51). He stated that his sleep is aided with Remeron and that he has been taking Effexor with limited effect. (DE 16, p. 51).

According to Plaintiff, he went to Centerstone because he suffered from "bad panic attacks" and being "nervous around people." (DE 16, pp. 52-53). He stated that his visits to Centerstone have helped him a little bit but he has three or four panic attacks per week. (DE 16, pp. 53, 58). Plaintiff stated he could not perform a job which permitted him to sit and stand at his own will and only required lifting items ten pounds or lighter because he could not sufficiently concentrate to perform the job. (DE 16, p. 54). According to Plaintiff, he has always had problems concentrating, even when employed as a bricklayer. (DE 16, p. 54). Plaintiff testified that he would still be working as a brick mason if he had not hurt his back. (DE 16, p. 55).

Plaintiff submitted a Function Report on February 24, 2010, in which he stated that his back pain is constant throughout the day and affects his sleep, general activity level, stress levels,

and personal hygiene habits. (DE 16, pp. 130-131). He stated that he mainly prepares food that is frozen or from a can; he prepares food in a crockpot on occasion. (DE 16, p. 132). Bending over to clean dishes caused pain, but Plaintiff could clean dishes, vacuum, mop, and dust with great effort. (DE 16, p. 132). He stated that he was nervous around a lot of people which inhibited him from making trips to the store, but he went shopping about once a week. (DE 16, p. 133). He estimated that he can only walk one mile before the pain in his back and hip would make him stop. (DE 16, p. 135).

## D. VOCATIONAL EXPERT'S TESTIMONY

The VE testified that Plaintiff's prior work as a masonry worker was a heavy job with a SVP of 7. (DE 16, p. 58). Plaintiff's former work as a brick layer then laborer was heavy work with a SVP of 8. (DE 16, p. 58).

The ALJ posed the following hypothetical RFC to the VE: an individual with the same age, education, and work experience as Plaintiff, who could perform light work with a sit-stand option, and who was limited to having only occasional interpersonal contact with coworkers and the public. (DE 16, p. 59). The VE testified that such an individual could perform the duties of a surveillance system monitor[6] (sedentary, unskilled, SVP 2). (DE 16, p. 59). The individual could also work as a cleaner,[7] but the sit-stand option and limited interpersonal relationship restriction would cut the available number of positions in half. (DE 16, p. 59). Additionally, the individual could perform the role of a garment sorter,[8] but the sit-stand option and limited interpersonal relationship restriction would reduce the available number of positions by a third. (DE 16, p. 59). If an individual with the RFC described above would have to elevate his left leg for two hours in an eight-hour workday, no jobs would be available. (DE 16, p. 60).

---

[6] DOT number 379.367-010. Nationwide: 30,200 jobs. State of Tennessee: 419 jobs.
[7] DOT number 323.687-014. Nationwide: 414,959 jobs. State of Tennessee: 8,903 jobs.
[8] DOT number 222.687-014. Nationwide: 229,240 jobs. State of Tennessee: 9,500 jobs.

### III.    CONCLUSIONS OF LAW

**A.  STANDARD OF REVIEW**

This Court reviews the record as a whole to determine whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ made those findings in accordance with the correct legal standards. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). "Substantial evidence is less than a preponderance but more than a scintilla." *Id.* The ALJ's decision shall be upheld if the evidence in the record is such that a "reasonable mind might accept [it] as adequate to support a conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013), *reh'g denied* (May 2, 2013). This is true even when substantial evidence favors an opposite conclusion. *Id.* Failure to follow the proper legal standards, however, implies a lack of substantial evidence. *Id.*

**B.  PROCEEDINGS AT THE ADMINISTRATIVE LEVEL**

A claimant is "disabled" within the meaning of the Act if an extended medically determinable physical or mental impairment prevents him from engaging in SGA. 42 U.S.C. §§ 1381a; 1382c(a)(3)(A). The Commissioner assesses disability under a five-step test:

(1) If the claimant is engaged in SGA, the claimant is not disabled.

(2) If the claimant's physical or mental impairment, or combination of impairments, is not severe or does not meet the duration requirement, the claimant is not disabled.

(3) If the claimant's impairment(s) meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled, and the inquiry ends.

(4) Based on the claimant's RFC, if the claimant can still perform past relevant work, the claimant is not disabled.

(5) If the claimant's RFC, age, education, and work experience indicate that the claimant can perform other work, the claimant is not disabled.

20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).

From step one through step four, the burden of proof is on the claimant. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). At step five, the burden shifts to the Commissioner, who may meet this burden by "identify[ing a] significant number of jobs in the economy that accommodate the claimant's [RFC] and vocational profile." *Id.*

## IV.  ANALYSIS

### A.  PLAINTIFF'S STATEMENT OF ERRORS

Plaintiff contends the ALJ erred in the following ways:

(1) The ALJ violated SSR 96-8p by failing to consider the effects of Plaintiff's bipolar II disorder current most recent episode hypomanic and panic disorder without agoraphobia on his ability to work;

(2) The ALJ should have found that Plaintiff's bipolar, panic, and cluster personality disorder meet or equal the requirements of Listing 12.04, 12.06, or 12.08;

(3) The ALJ failed to comply with the required technique for analyzing mental impairments under 20 C.F.R. § 416.920a;

(4) The ALJ gave insufficient conclusory reason for rejecting Dr. Bachuss' opinion regarding Plaintiff's bipolar and panic disorders;

(5)  The ALJ inappropriately relied on GAF scores;

(6) The ALJ gave too little weight to Plaintiff's treating chiropractors and mental health therapists; and

(7) The ALJ erred in finding that Plaintiff did not allege side effects from his medication.

(DE 19-1).

### B.  The ALJ Complied with SSR 98-8P

Plaintiff argues that the ALJ, in assessing his RFC, violated SSR 96-8p by "fail[ing] to consider the impact of two medically diagnosed conditions, Bipolar II Disorder Current, Most Recent Episode: Hypomanic . . . and Panic Disorder Without Agoraphobia." (DE 19-1, p. 6). According to Plaintiff, the CRG form administered by Ms. Grice reveals the limitations imposed

by these disorders. (DE 19-1, p. 6). Plaintiff further claims the ALJ neither considered the length of his treatment at Centerstone nor the three separate incidents in which his back doctors, Dr. McCall, Dr. Wade, and Dr. Weisman, remarked that Plaintiff was depressed. (DE 19-1, pp. 7-8).

Defendant contends that the ALJ fulfilled the mandate of SSR 96-8p when "he explicitly recognized that 'the combined effects of all impairments must be considered in determining the matter of severity even if each impairment alone is not severe.'" (DE 24, p. 5). Defendant further references the ALJ's discussion of Plaintiff's mental impairments in addressing whether Plaintiff met the requirements of a listed impairment. (DE 24, pp. 5-6). In response to Plaintiff's contention that the ALJ neglected to reference the CRG form or Ms. Grice's opinions, Defendant asserts that "an ALJ is not required to discuss all the evidence in the record." (DE 24, p. 5) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 508 (6th Cir. 2006)).

In assessing a claimant's RFC, SSR 96-8p requires ALJs to consider the limiting effects of the claimant's severe and non-severe impairments. 1996 WL 374184, at \*5; *see* 20 C.F.R. §§ 404.1545 and 416.945. The RFC assessment should address the claimant's physical and mental abilities on a "function-by-function basis." SSR 96-8p, 1996 WL 374184, at \*1; 20 C.F.R. §§ 404.1545(b)-(c) and 416.945(b)-(c). Though the ALJ is not required to produce the function-by-function analysis in writing, the ALJ must "articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Delgado v. Comm'r of Soc. Sec.*, 30 F.App'x 542, 547–48 (6th Cir. 2002) (citation omitted).

The ALJ's "listed impairment" analysis at Step 3 and subsequent RFC analysis are similar, yet separate inquiries. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(A) ("An assessment of your RFC complements the functional evaluation necessary for paragraphs B and

C of the listings."); SSR 96-8p, 1996 WL 374184, at *4. ALJs may, however, "incorporate the [psychiatric review technique] findings into the RFC" assessment. *Riggs v. Colvin*, 3:13-CV-1037-DW, 2014 WL 2440706, at *15 (W.D. Ky. May 30, 2014); *Preston v. Comm'r of Soc. Sec.*, 12-11413, 2013 WL 3944419, at *5 (E.D. Mich. July 31, 2013) ("Although the ALJ did not mention Plaintiff's emotional impairments when making his RFC determination—between steps three and four—he did provide the necessary discussion [at] step two . . . . Therefore, remanding this case to the ALJ for further discussion would be futile."); *Marcum v. Astrue*, 1:11-CV-810, 2013 WL 1196657, at *2 (S.D. Ohio Mar. 25, 2013) (allowing the mental RFC analysis to consist of: "the following [RFC] assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis.").

Substantial evidence supports the ALJ's mental RFC assessment. As in *Marcum*, the ALJ stated that "the following [RFC] assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (DE 16, p. 32). *See* 2013 WL 1196657, at *2. While analyzing the listed impairments, the ALJ considered the medical records provided by Centerstone, as well as recognized the seventeen-month duration of Plaintiff's treatment at Centerstone. (DE 16, p. 32). Further, the ALJ discussed the medical records in which Plaintiff was noted as "depressed," considered the assessment provided by the state agency psychologist, and reported that Plaintiff attended the administrative hearing "without appearing to be in any obvious distress." (DE 16, pp. 31-33). As discussed in Part IV-G, neither the CRG form nor Ms. Grice's opinions are owed controlling weight. The ALJ considered the pertinent records, and this claim of error is therefore without merit.

**C. Plaintiff Does Not Meet Listing 12.04, 12.06, or 12.08**

Plaintiff further contends that the ALJ's failure to reference or "consider" the CRG assessment administered by Ms. Grice requires reversal as the CRG assessment indicates Plaintiff meets Listing 12.04, 12.06, and 12.08. (DE 19-1, pp. 8-10). Defendant argues that Plaintiff failed to meet his burden of proving a listed impairment and that the ALJ was not required to adopt the findings in the CRG form because it was an opinion from an "other source." (DE 24, pp. 7-8).

As discussed *infra* at Part IV-G, Ms. Grice's opinions and the CRG assessment merit consideration, yet they are not granted the controlling weight of a treating source's opinion. Furthermore, substantial evidence supports the ALJ's Step 3 listed impairment analysis. The ALJ considered the Centerstone records in this analysis and discussed other evidence in the record which contradicted the Centerstone findings and supported the ALJ's conclusions. (DE 16, p. 32). Plaintiff's reliance on the CRG form is misplaced.

**D. The ALJ Correctly Analyzed Plaintiff's Mental Impairments**

As explained in Plaintiff's brief, the ALJ must assess the impact the claimant's mental impairment has on his (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) episodes of decompensation. (DE 19-1, pp. 10-11). 20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3). Plaintiff also correctly notes that ALJs are no longer required to complete the Psychiatric Review Technique Form, but rather must incorporate this analysis into their written decisions. 20 C.F.R. §§ 404.1520a(e)(4) and 416.920a(e)(4).

Plaintiff claims the ALJ "failed to discuss the frequency of any deficiencies of concentration, the impact of Hickman[']s depression and anxiety on his social functioning or his daily activities, or whether he had ever experienced episodes of decompensation." (DE 19-1, pp.

10-11). According to Defendant, the ALJ correctly analyzed Plaintiff's mental impairments, restating the ALJ's conclusions that "Plaintiff had mild limitations in activities of daily living; moderate difficulties in social functioning; moderate limitations maintaining concentration, persistence, or pace; and no episodes of decompensation." (DE 24, p. 10).

The ALJ appropriately set forth the four-factor analysis. (DE 16, p. 29). After finding that Plaintiff suffered from severe impairments, the ALJ assessed the four functional areas and referenced portions of the record supporting this assessment. (DE 16, pp. 28-29). Plaintiff's claim of error therefore fails.

### E. The ALJ Did Not Violate the Treating Physician Rule

Plaintiff claims the ALJ violated the treating physician rule in rejecting the opinions of Ms. Grice, Ms. Stahley, and Dr. Bachuss. (DE 19-1, pp. 13-14). Plaintiff further argues that the ALJ violated the "good reasons" requirement in 20 C.F.R. § 404.1527(d)(2) and SSR 96-2p by "fail[ing] to provide the requisite specificity for rejecting the opinions of Viviana Grice, Melinda Stahley, and Dr. Bachuss." (DE 19-1, p. 14). According to Plaintiff, Dr. Bachhus provided opinions by signing the CRG form and approving the course of treatment. (DE 19-1, p. 14).

Defendant questions "whether the opinion [in the CRG form] is properly attributable to Dr. Bachuss" and also whether the CRG form "constitute[s] a medical opinion from a treating source." (DE 24, p. 8). Citing 20 C.F.R. §§ 404.1513(a) and 416.913(a) for the proposition that therapists are neither "treating sources" nor other "acceptable medical sources," Defendant contends that Ms. Grice's opinion is not entitled to controlling weight. (DE 24, p. 8). Rather, Defendant claims Ms. Grice is an "other source," and according to SSR 06-03p, her opinion may be used to show how severe Plaintiff's impairments are and how they affect his ability to work. (DE 24, p. 8). Defendant further contends that Dr. Bachuss was not a "treating physician" when

Plaintiff completed the CRG form since it was done during Plaintiff's first visit with Dr. Bachuss. (DE 24, pp. 9-10).

The ALJ did not violate the treating physician rule because Dr. Bachuss was not a treating source, and the treating physician rule therefore did not apply.[9] A treating source must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition. 20 C.F.R. §§ 404.1502 and 416.902. Precedent in this Circuit suggests that a physician who treats an individual only twice or three times does not constitute a treating source. *Kornecky*, 167 F.App'x at 506–07; *Daniels v. Comm'r of Soc. Sec.*, 152 F.App'x 485, 491 (6th Cir. 2005); *Coy v. Astrue*, 2012 U.S. Dist. LEXIS 161980, at *15 (N.D. Ohio Nov. 13, 2012); *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008). Dr. Bachuss' signature appears on two records from Centerstone, and even then it appears the mental evaluations were completed by Ms. Stahley. (DE 16, pp. 305, 329-330). From the records provided, it would be a stretch to say Dr. Bachuss had the type of doctor-patient relationship recognized by the treating physician rule. *See* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) (providing the rationale for the treating physician rule: more weight is given to a professional who can "provide a detailed, longitudinal picture of . . . medical impairments.").

Furthermore, opinions rendered during a physician's first visit with a claimant are not entitled to controlling weight. *Kornecky*, 167 F.App'x at 506 ("The question is whether Lian had the ongoing relationship with Kornecky to qualify as a treating physician *at the time he rendered his opinion*.") (emphasis added). Even if Dr. Bachuss had signed Plaintiff's CRG form, the opinion would not be entitled to deference because it was completed during Plaintiff's first visit at Centerstone and possibly his first visit with Dr. Bachuss. (DE 16, pp. 293-295).

---

[9] The weight given to Ms. Grice's and Ms. Stahley's opinions is discussed *infra* at Part IV-G.

**F. The ALJ Properly Considered Plaintiff's GAF Scores**

Plaintiff argues the ALJ failed to offer evidence to support his statement that the Centerstone GAF was inconsistent with the Diagnostic and Statistical Manual of Mental Disorders (4th edition) ("DSM"). (DE 19-1, p. 16). Plaintiff further contends that the "ALJ relies almost exclusively upon the GAF as the measurement of the severity of Hickman's mental disorders" while failing to consider the Centerstone records as required by 20 C.F.R. §§ 404.1513(c)(2) and (d). (DE 19-1, pp. 16-17). Defendant did not address this claim. (DE 24).

Though GAF scores are not dispositive, they "elucidate[ ] an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 F.App'x 681, 684 (6th Cir. 2011) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). GAF scores may also be used to "evaluate the consistency and credibility of [a physician's] opinion and to determine what weight it should be given." *Bratton v. Astrue*, 2010 U.S. Dist. LEXIS 72752, at *24 (M.D. Tenn. July 15, 2010).

The ALJ appropriately utilized the GAF assessments provided in the record. Noting that Plaintiff could "go[ ] for walks, shops, and visits other family members," the ALJ cited evidence contradicting the GAF score announced by Centerstone, 40,[10] and supporting the GAF score provided by Dr. Petro, 52.[11] (DE 16, p. 32). Indeed, Plaintiff's own intake form from Centerstone reported Plaintiff's highest GAF score as 45. (DE 16, p. 295). Plaintiff's subsequent argument that the ALJ failed to consider the Centerstone records is repetitious and without merit. The ALJ specifically referenced the exhibit containing the Centerstone records and additionally pointed

---

[10] According to the DSM, a GAF score between 31 and 40 indicates "Some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."

[11] A score between 51 and 60 reflects "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

out that Plaintiff's RFC at Centerstone was "never assessed greater than 40," Plaintiff was a "'No Show' for several appointments," and Plaintiff's panic attack history had not been recorded by a treating source. (DE 16, p. 32). From this, it is readily ascertainable that the ALJ considered the Centerstone records in his assessment. This claim of error is therefore without merit.

## G. The ALJ Considered Ms. Grice's and Ms. Stahley's Opinions

Plaintiff next contends that the ALJ failed to analyze the opinions of Ms. Grice and Ms. Stahley as required under 20 C.F.R. §§ 404.1513(d) and 416.913(d) and SSR 06-03p. (DE 19-1, pp. 17-19). Defendant argues that as non-treating sources, Ms. Grice and Ms. Stahley's opinions should be *considered* to determine the severity and functional effects of Plaintiff's impairments, but that the ALJ is not required to "expressly *discuss* every piece of record evidence." (DE 24, pp. 8-9) (emphasis added). Noting that the ALJ was aware of SSR 06-03p and had cited to the exhibit containing Ms. Grice's opinion, Defendant argues this shows the ALJ considered the non-treating sources' opinions. (DE 24, p. 9).

According to 20 C.F.R. §§ 404.1513(d) and 416.913(d), evidence from "other sources," which includes "nurse-practitioners . . . and therapists," may be used to show the severity of an impairment and its effect on a claimant's ability to work. *See also* SSR 06-03p, 2006 WL 2329939, at *2–3. While evidence from other sources should be "evaluated" and considered, the ALJ should either mention the weight given to the other sources' opinion or provide sufficient discussion to permit the claimant or another reviewer to understand the ALJ's rationale. SSR 06-03p, 2006 WL 2329939, at *3–4, 6.

As Ms. Grice is a psychotherapist and Ms. Stahley is a nurse practitioner, their opinions are from "other sources." Though Plaintiff contends that the ALJ's assessment of these opinions was too circumspect, the ALJ satisfactorily analyzed their records. Referencing the exhibit

containing the Centerstone records, the ALJ addresses the length of the treating relationship, missed appointments, Plaintiff's reports during treatment which undercut his supposed GAF score, and the absence of documented panic attacks. (DE 16, p. 32). The ALJ considered Centerstone's records and sufficiently explained his treatment of the records in light of the record as a whole. This claim of error thus fails.

## H. Medication Side Effects

Plaintiff claims the ALJ violated SSR 96-7p, SSR 96-8p, and 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416.929(c)(3)(iv) by failing to reference medication side effects in Plaintiff's RFC. (DE 19-1, p. 19). Plaintiff does not specify the side effects alleged or the medication at issue. Defendant did not address this claim. (DE 24).

Plaintiff correctly notes that the ALJ should consider the "type, dosage, effectiveness, and side effects of any medication" used to address pain and other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416.929(c)(3)(iv); SSR 96-7p, 1996 WL 374186, at *3; SSR 96-8p, 1996 WL 374184, at *5. Despite this requirement "the proper task of the ALJ is not to thoroughly catalog each of a claimant's conditions and medications, but to 'address[] the limiting effects of [the claimant's] combination of impairments.'" *Jackson v. Comm'r of Soc. Sec.*, 09-14089, 2011 WL 768087, at *1 (E.D. Mich. Feb. 28, 2011) (finding no error because "Plaintiff fail[ed] to explain how this testimony, if fully credited, would be inconsistent with the RFC determined by the ALJ.").

Plaintiff has not indicated how his RFC should be adjusted taking his alleged side effects into consideration. The ALJ's opinion references alleged side effects from Plaintiff's medications, stating Plaintiff "is currently prescribed Remeron 15 mg, and Effexor 37.5 mg (increased to 75mg before the hearing), for his alleged mental impairments. With regard to side

effects, the claimant stated his medications occasionally cause him to become drowsy." (DE 16, p. 31). Plaintiff does not suggest where the ALJ's discussion is lacking or how Plaintiff's RFC determination would be impacted, and it therefore appears that the ALJ's decision is supported by substantial evidence.

## V.    RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (DE 19) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

Within fourteen (14) days from receipt of this R&R, the parties may serve and file written objections to the findings and recommendations made herein. Fed. R. Civ. P. 72(b)(2). Parties opposing the objections must respond within fourteen (14) days from service of these objections. *Id.* Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 1111 (1986).

**ENTERED** the 18th day of June, 2014,


/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge